SALVATORE RINALDI *v.* TOWN OF ENFIELD
(AC 23834)

Schaller, Bishop and McLachlan, Js.

Argued January 13—officially released April 20, 2004

*Lisa Banatoski Mehta*, for the appellant-appellee (defendant).

*Gerald V. Davino II*, for the appellee-appellant (plaintiff).

*Opinion*

SCHALLER, J. The defendant town of Enfield appeals from the decision of the workers' compensation review board (board) reversing in part and affirming in part the decision of the workers' compensation commissioner (commissioner). The plaintiff, Salvatore Rinaldi, cross appeals from the same decision. On appeal, the defendant claims that the board improperly failed to include

the plaintiff's retirement pension and social security benefits in its General Statutes § 31-308a benefits calculation. The plaintiff, in his cross appeal, claims that the board improperly (1) applied the cap under General Statutes § 7-433b (b) to the combination of his § 31-308a benefits and retirement pension, and (2) determined that the defendant can make the plaintiff process his medical expenses through the defendant's group medical insurance carrier. We affirm the decision of the board.

The facts and procedural history are undisputed. The plaintiff, a police officer employed by the defendant, suffered a heart attack on October 5, 1990. For the next two years, the plaintiff received temporary total disability payments pursuant to the Workers' Compensation Act (act), General Statutes § 31-275 et seq. Those payments, supplemented by the payments received by the plaintiff under a collective bargaining agreement, provided the plaintiff with 100 percent of his regular pay.[1] The defendant made those payments because it had chosen to self-insure its workers' compensation liability.

On November 11, 1992, the plaintiff retired from the Enfield police department and began receiving his weekly retirement benefit in the amount of $541.34. The plaintiff's heart condition was a factor in his decision to retire as a police officer. The defendant continued to maintain the plaintiff's health insurance.

On January 29, 1993, the plaintiff reached maximum medical improvement with a 40 percent disability rating to his heart. As a result, the plaintiff's base rate for his specific indemnity benefit, determined pursuant to General Statutes §§ 7-433c and 31-308, was $421.10 per week for 321 weeks. The plaintiff received only $187.76

---

[1] The plaintiff was eligible only for the supplemental payments for two years under the terms of the collective bargaining agreement.

per week, however, because of the application of the cap imposed by § 7-433b (b). In a 1995 hearing, the commissioner found § 7-433b (b) to be inapplicable because it applied only to disability related retirements. The commissioner found that the plaintiff had opted for a regular retirement, which entitled him to specific indemnity benefits and full retirement pension without a cap. The commissioner then ordered the defendant to pay the full specific indemnity benefits and the retirement benefit, less amounts already paid, retroactive to January 29, 1993.

The plaintiff exhausted his specific indemnity benefit on February 6, 1999. The plaintiff had previously found work, on a part-time basis, as a judicial marshal. The plaintiff's income was supplemented by social security benefits and his retirement pension.

Beginning in 1998, the plaintiff sought discretionary benefits, available under § 31-308a, to bolster his income because of his diminished earning capacity. The plaintiff also sought to have the defendant reimburse him directly for medical expenses related to his claim rather than process the expenditures through the defendant's health insurance carrier. At a hearing in 2001, a different commissioner held that the plaintiff was entitled to 156 weeks of § 31-308a benefits. The commissioner allowed the defendant to continue to process the plaintiff's medical expenditures through its group health insurance plan. Although prompted by the defendant, the commissioner declined to review the validity of the prior decision concerning the § 7-433b (b) cap because he held that the prior decision was the law of the case.

Both the defendant and the plaintiff appealed to the board from the commissioner's decision. The plaintiff took issue with the commissioner's decisions regarding the processing of medical expenses and the offset of

the § 31-308a award by the plaintiff's regular pension benefits. The defendant took issue with the commissioner's failure to include social security benefits in the setoff of the § 31-308a award. The board reversed the commissioner's decision and held that under the doctrine of "the law of the case," the "§ 7-433b (b) cap indeed applies to the combination of the [plaintiff's] pension and his § 31-308a benefit entitlement." The board upheld the commissioner's decision to allow the defendant to continue to have the plaintiff process his medical expenditures through the group health insurance rather than directly through the defendant. The board also upheld the commissioner's decision to exclude social security benefits in the § 31-308a calculation of benefits. The board reversed the commissioner's decision to include retirement benefits in the § 31-308a calculations.

## I

## THE DEFENDANT'S APPEAL

The defendant claims that the board improperly failed to include the plaintiff's retirement pension and social security benefits in its § 31-308a calculation. The defendant argues that "[a]s a matter of law, § 31-308a requires consideration of all the [plaintiff's] earnings, potential or otherwise, factoring in the statutory criteria of the nature and extent of the injury, training, education, experience, the availability of work based on the person's physical condition and the individual's age." The defendant also argues that it is against public policy to exclude the plaintiff's retirement pension and social security benefits from the § 31-308a calculation.

## A

The defendant argues that the language of § 31-308a dictates that retirement benefits and social security benefits should be considered when calculating an award

of § 31-308a benefits. Our review of an agency's interpretation of a statute depends on the legal history of the statute; if the proffered interpretation is a " 'time-tested agency interpretation of a statute' "; *Marone* v. *Waterbury*, 244 Conn. 1, 9, 707 A.2d 725 (1998); then we will afford the interpretation deference. If, however, the agency's interpretation of the statute "has not previously been subject to judicial scrutiny . . . the agency is not entitled to judicial deference"; id., 10; and we engage in a plenary review of the interpretation. *Esposito* v. *Waldbaum's*, 78 Conn. App. 472, 475, 827 A.2d 747 (2003). As the board acknowledged in its decision, that aspect of the statute has not been interpreted before, and we, therefore, afford plenary review to the board's interpretation.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc). The language of the statute is the most important consideration in determining the meaning of the statute. Id. In addition, the legislature has stated that courts should first look to the plain meaning of the words of the statute when interpreting the statute's meaning. Public Acts 2003, No. 03-154. In light of those principles, we turn to the language of the statute." (Internal quotation marks omitted.) *State* v. *Groppi*, 81 Conn. App. 310, 317–18, 840 A.2d 42 (2004).

Section 31-308a provides in relevant part: "(a) In addition to the compensation benefits provided by section 31-308 . . . the commissioner . . . may award additional compensation benefits for such partial permanent disability . . . equal to seventy-five per cent of the difference between the wages currently earned by an employee in a position comparable to the position held by such injured employee prior to his injury . . . and the weekly amount which such employee will probably be able to earn thereafter . . . to be determined by the commissioner based upon the nature and extent of the injury, the training, education and experience of the employee, the availability of work for persons with such physical condition and at the employee's age . . . . (b) . . . [A]dditional benefits provided under this section shall be available only when the nature of the injury and its effect on the earning capacity of an employee warrant additional compensation."

In interpreting that statute, the board focused on the word "earn" and stated that "a [retirement] pension paid based upon the claimant's years of service with an employer neither reflects the claimant's earning capacity, nor does it constitute an attempt by an employer to compensate a claimant for his inability to continue earning wages due to an injury. Instead, it is payable pursuant to a separate contractual provision that is wholly unrelated to the amount a claimant is currently able to earn. Such longevity pensions are generally based upon the years of service that a retired employee has devoted to a particular employer, and they remain payable even if that individual decides to go out and get another job, regardless of how much it might pay." Regarding social security benefits, the board stated that "old-age insurance benefits do not reflect either the amount a claimant is able to earn, or an attempt by the federal government to replenish lost wages due to a work-related disability. Rather, they

are directly tied to the amount of money that one has contributed to Social Security throughout one's working life, and are paid once an individual has reached the statutory age of retirement, and has left the work force."

We agree with the board's interpretation of the word "earn."[2] The language of the statute justifies the exclusion of retirement and social security benefits from the calculation of a § 31-308a award. The statute focuses on the injured party's training, injuries and experience; in essence, the ability of the injured party to generate money in the future, not what funds the injured party previously has secured through work. For example, the statute does not mention that the commissioner, when conducting an analysis under the statute, should look to the injured party's personal savings or private retirement plans.

In assailing the board's conclusions, the defendant relies heavily on *Iannarone* v. *State*, No. 4138, CRB-7-99-10 (June 15, 2001). In *Iannarone*, the board held that a retirement disability pension should be included in the § 31-308a calculations. Id. *Iannarone* is distinguishable from the present case, however, because the plaintiff is receiving a retirement pension, rather than a disability pension.

The defendant also relies on *Carriero* v. *Naugatuck*, 243 Conn. 747, 707 A.2d 706 (1998). In *Carriero,* our Supreme Court held that the cap embodied in § 7-443b was applicable to an award under § 7-443c. The court also held that retirement benefits should be included in the calculation under the cap. Id., 757. *Carriero* is

---

[2] The defendant argues that for tax purposes, social security benefits and retirement benefits are partially taxable as gross income. From that, the defendant argues that such benefits are deferred compensation and, thus, are "earnings." Even if such benefits were considered "earnings" in the realm of tax law, we do not necessarily think that we, or the board, are precluded from interpreting the word differently in the context of workers' compensation law.

distinguishable from the present case, however, because the underlying statutes in *Carriero* and those in the present case are quite different. As our Supreme Court stated, "§ 7-433c payments constitute special compensation, or even an outright bonus, to qualifying policemen and firemen. . . . [T]he outright bonus provided by the statute is that the claimant is not required to prove that the heart disease is causally connected to his employment, which he would ordinarily have to establish in order to receive benefits pursuant to the Workers' Compensation Act." (Citation omitted; internal quotation marks omitted.) Id., 754–55. In contrast, although § 31-308a could be characterized as a bonus, it is completely discretionary. Thus, *Carriero* is not controlling. We agree with the board's position that disability retirement pensions are different from regular retirement pensions and, as such, may be treated differently in the context of § 31-308a.

B

The defendant also argues that the board's interpretation of the statute is untenable because it violates public policy, specifically the policy underlying the act. The defendant asserts that the policy prohibiting double recovery is violated by the board's decision because the plaintiff, at some points, received more than a working police officer.

Even if we assume arguendo the validity of the defendant's arguments, the board, in its decision, has prevented the accrual of a windfall to the plaintiff. The board's decision explicitly caps the plaintiff's recovery by importing the limitation of § 7-433b (b) to a recovery pursuant to § 31-308a. With the cap, there is no potential for a windfall. The board's decision does not address the issue of injured parties, other than fire and police personnel, seeking benefits under § 31-308a. Although the defendant's arguments may be effective in future

situations not involving fire or police personnel, the arguments do not apply here because § 7-433b (b) caps recovery by police personnel. Jurisprudential considerations require that we address the case before us and refrain from ruling on hypothetical situations. See generally *State* v. *McElveen*, 261 Conn. 198, 204–205, 802 A.2d 74 (2002) ("courts are called upon to determine existing controversies, and . . . may not be used as a vehicle to obtain advisory judicial opinions on points of law").

## II

## CROSS APPEAL

The plaintiff claims that the board improperly applied the § 7-433b (b) cap to the combination of his § 31-308a benefits and retirement pension. The plaintiff argues that the board failed to apply the doctrine of collateral estoppel and the "date of injury" rule when it determined that § 7-433b (b) applied.[3]

## A

The plaintiff argues that the board improperly failed to apply the doctrine of collateral estoppel when it determined that the § 7-433b (b) cap applied to his § 31-308a benefits. The defendant's argument fails, however, because the issue of whether the § 7-433b (b) cap

---

[3] Although not briefed separately, the plaintiff also appears to argue that General Statutes § 31-315 prevents the board from opening the 1995 judgment. Although the plaintiff is correct in arguing that § 31-315 would limit the board's ability to modify the judgment from the 1995 hearing; see *Marone* v. *Waterbury*, supra, 244 Conn. 15; the relevant judgment at issue was the judgment from the 2001 hearing, which was appealed to the board. The plaintiff seeks to frame that as the opening of the 1995 judgment, but that is incorrect, as the cap under § 7-433b (b) was applied to the plaintiff's benefits under § 31-308a, which were a feature of the 2001 judgment, not the plaintiff's benefits under §§ 7-443c and 31-308, which were at issue in the 1995 judgment. As such, § 31-315 is inapplicable.

applies to § 31-308a benefits was not actually litigated in the prior proceeding.

"Whether the [board] properly applied the doctrine of collateral estoppel is a question of law for which our review is plenary. . . . The fundamental principles underlying the doctrine are well established. Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . We must, therefore, determine whether the issues raised . . . were actually litigated and necessarily determined on previous occasions." (Citation omitted; internal quotation marks omitted.) *Bouchard* v. *Sundberg*, 80 Conn. App. 180, 187, 834 A.2d 744 (2003).

Collateral estoppel is inappropriate in this case for two reasons. First, the underlying statutes were different. At the 1995 hearing, the commissioner was asked to decide whether the limitation embodied in § 7-433b (b) applied to the specific benefits that the plaintiff was entitled to under §§ 31-308 and 7-433c. In contrast, at the 2001 hearing, the issue before the commissioner was whether the § 7-433b (b) cap applied to discretionary benefits granted under § 31-308a. The statutes, §§ 31-308 and 31-308a, are different in terms of their application and underlying goals. Second, the issues at the two hearings were different. At the 1995 hearing, the issue was one of fact—whether the decision to retire was caused by the disability. At the 2001 hearing, the issue was one of law—whether § 7-443b (b) should apply to § 31-308a benefits. It is axiomatic that collateral estoppel, or issue preclusion, does not apply when the issue has not been raised or decided previously. The board correctly refused to apply the doctrine of collateral estoppel.

B

The plaintiff also argues that the board failed to apply the "date of injury" rule when it determined that § 7-433b (b) applied.[4] The plaintiff did not advance that argument before the board. This court has stated that "[t]he theory upon which a case is tried in the trial court cannot be changed on review, and an issue not presented to or considered by the trial court cannot be raised for the first time on review. Moreover, an appellate court should not consider different theories or new questions if proof might have been offered to refute or overcome them had they been presented at trial." *Ritcher* v. *Childers*, 2 Conn. App. 315, 318, 478 A.2d 613 (1984); see also *Menon* v. *Dux*, 81 Conn. App. 167, 171, 838 A.2d 1038 (2004); *Strouth* v. *Pools by Murphy & Sons, Inc.*, 79 Conn. App. 55, 62, 829 A.2d 102 (2003). A review of the record indicates that the plaintiff did not present this theory of the case to the commissioner or the board. "For this court to now consider [the plaintiff's] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [board] and to the opposing party." (Internal quotation marks omitted.) *Menon* v. *Dux*, supra, 171.

C

The plaintiff also claims that the board improperly determined that the defendant can make the plaintiff process his medical expenses through the defendant's group medical insurance carrier. The plaintiff argues that the language of the act requires the employer to pay

---

[4] "The date of injury rule is a rule of statutory construction that establishes a presumption that new workers' compensation legislation affecting rights and obligations as between the parties, and not specifying otherwise, applie[s] only to those persons who received injuries after the legislation became effective, and not to those injured previously." (Internal quotation marks omitted.) *Esposito* v. *Waldbaum's, Inc.*, supra, 78 Conn. App. 474 n.3.

directly for the employee's medical expenses related to his claim for benefits under § 7-443c.

As that claim presents pure questions of law, our review is plenary. See *Schiano* v. *Bliss Exterminating Co.*, 260 Conn. 21, 33–34, 792 A.2d 835 (2002). The board held that "[u]nder the binding precedent of *Plainville* [v. *Travelers Indemnity Co.*, 178 Conn. 664, 425 A.2d 131 (1979)], § 31-284's mandate that an employer either 'furnish . . . satisfactory proof of his solvency and financial ability to pay directly to injured employees or other beneficiaries *compensation provided by this chapter* [or] insure his full liability *under this chapter*' does not implicate benefits based upon conditions that would not qualify as compensable under chapter 568 [of the General Statutes], such as § 7-433c compensation. . . . Thus, some alternate means of paying § 7-433c benefits may be devised by the town, including the use of a group health insurance policy to process medical bills." (Emphasis in original.)

The plaintiff references a bevy of statutes from the act, all utilizing the word "employer," and argues that the use of that word requires the "employer" to provide services for the injured employee. The plaintiff ignores, however, that many of the statutes refer to the employer or the employer's insurer. See General Statutes §§ 31-294d and 38a-470. Thus, the plaintiff's contention that the act forces the employer to be the exclusive processor of claims is not supported by the language of the act.

As set forth in part I A of this opinion, the language of the statute is the most important factor in determining what the statute means. Because the language of § 7-433c makes no reference to that issue, it is not helpful. The legislative history, however, is useful.

"During the debate on the floor of the House of Representatives, Representative Robert D. King raised the following question:

" 'Mr. Speaker, one question, through you to either Rep. Stevens or Rep. Badolato, in the wisdom of the Supreme Court, as I understand the decision, the particular member of the department is not covered by workmen's compensation and, as a result, this bill would, in effect, shift the burden to the town, to the municipality. Now, my question, very briefly, is this—In what manner is the town compensated for this potential liability? Does the town, in turn, insure or does it come out of the town's general fund or is there some other method of compensating for any payments that will have to be made under the bill?'

"Representative Gerald F. Stevens, who introduced the bill in the House, responded as follows:

" 'That would be the determination of the particular municipality who could either choose to insure against this particular risk or pay for it out of the general revenues of the municipality if they chose to be a self-insurer for the purposes of this legislation.' 14 H.R. Proc., Pt. 8, 1971 Sess., pp. 3526–27." *Plainville* v. *Travelers Indemnity Co.*, supra, 178 Conn. 674 n.3. Those statements support the board's conclusion that the defendant may choose to use an insurance company to manage the risk generated by the statute. Accordingly, the board correctly concluded that as long as the defendant continues to repay any expenses that are not reimbursed by the insurance company, the defendant may use an insurance company to process the claims.

The decision of the workers' compensation review board is affirmed.

In this opinion the other judges concurred.